# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JANET CLASEN, *for herself and on behalf of her minor child*, M.S.,

    *Plaintiff,*

vs.

    Case No. 17-1280-EFM

UNIFIED SCHOOL DISTRICT NO. 266 and
SEDGWICK COUNTY AREA
EDUCATIONAL SERVICES
INTERLOCAL COOPERATIVE NO. 618,

    *Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Janet Clasen brings this lawsuit on behalf of her minor child, M.S. This is a special education case whereby Clasen appeals a Kansas State Department of Education decision under the Individuals with Disabilities Education Act ("IDEA") and asserts additional claims under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act. Before the Court are Defendants' Unified School District No. 266 ("USD 266") and Sedgwick County Area Educational Services Interlocal Cooperative No. 618 ("SCAESIC 618") Motions for Judgment on the Administrative Record of the IDEA claims (Docs. 127 & 131), Motions for Summary Judgment on the Section 504 and ADA Claims (Docs. 132 & 133), and Plaintiff's

Motion for Summary Judgment (Doc. 129). For the reasons below, the Court grants Defendants' motions and denies Clasen's motion.

## I.     Factual and Procedural Background[1]

M.S. is a minor and was, at all times material to this case, enrolled as a student at USD 266 (Maize School District). She is a child with a disability under the IDEA,[2] the ADA,[3] and § 504 of the Rehabilitation Act.[4] Janet Clasen is M.S.'s mother, and they both reside in Maize, where M.S. attends school. USD 266 is a local education agency under the IDEA.[5] SCAESIC 618 is a special education interlocal that provides educational services to nine school districts, including USD 266. As a result, SCAESIC 618's employees have provided special education services to M.S.

M.S. has been diagnosed with Down Syndrome, attention deficit hyperactivity disorder, heart conditions, and hypothyroidism. She was identified as qualifying for special education services under the IDEA at age three. On April 26, 2013, M.S. was reevaluated to determine her present levels of performance and special education needs. Clasen was involved in this reevaluation, requesting that M.S. be "mainstreamed" as much as possible. As a result of that evaluation, an individualized educational plan ("IEP") was developed for M.S on May 10, 2013.

---

[1] The facts come from the Final Pre-Trial Order and Hearing Officer Decision dated May 2, 2015. In accordance with summary judgment standards, the facts are construed in the light most favorable to the non-moving party. Clasen failed to appropriately or adequately controvert Defendants' factual statements relevant to this motion. Furthermore, Clasen set forth several additional facts in her responses to Defendants' motions that did not comply with Fed. R. Civ. P. 56 or D. Kan. Rule 56.1 standards, or were otherwise irrelevant to this motion.

[2] 20 U.S.C. § 1401(3).

[3] 42 U.S.C. § 12102.

[4] 29 U.S.C. § 794.

[5] 20 U.S.C. § 1401(19).

During the 2013-2014 school year, USD 266 and SCAESIC 618 conducted a functional behavior assessment ("FBA"), which is considered an evaluation under the IDEA. The FBA was prepared by Dean Stwalley, School Psychologist for SCAESIC 618.[6] During the 2013-2014 school year, M.S. attended kindergarten at Maize Central Elementary. Her general education teacher was Shari LaMunyon. M.S. was also in a Functional Applied Academics ("FAA") classroom for special education instruction in most of her core academic subjects. With these accommodations, M.S. made some educational progress and received satisfactory report cards.

At the request of M.S.'s parents, USD 266 agreed to keep M.S. in kindergarten for a second year with LaMunyon. This decision was partially based on the fact that M.S. would be undergoing heart surgery over the summer, causing her to miss several weeks of class at the beginning of the 2014-2015 school year. Additionally, M.S.'s parents wanted to see how M.S. would perform in a regular education classroom another year. The IEP team agreed to these changes and included more supplementary aids and services to address M.S.'s behavior using positive behavioral supports. M.S. made progress under this IEP during her second year of kindergarten and advanced to first grade for the 2015-2016 school year.

For first grade, M.S. was to be pulled out of the general education classroom for special education in language arts. At the request of M.S.'s parents, M.S. had two different general education teachers throughout the 2015-2016 school year. The parties disagree whether the pull-out was to be for 40-45 minutes—only part of the language arts class—or for 75 minutes—the entire general education language arts class time. In February 2016, the IEP team proposed also

_____

[6] Based upon the FBA, a behavior intervention plan ("BIP") was developed for M.S. Defendants provided prior written notice of the BIP to Clasen but failed to obtain her consent. As a result, Clasen filed a formal complaint with the Kansas State Department of Education alleging that the Defendants unlawfully added a behavior plan without consent. The investigator assigned to that case ruled in favor of Clasen.

pulling M.S. out of her general education classroom for 60 minutes of special education in math, but the parents did not consent to this change, so it was not implemented.

The following members of the IEP team testified that M.S.'s behavior made her unsuited for the general education classroom in math and reading: Lori Gabrielson, Kathy VanDeest, Kim Pohl, Dean Stwalley, and Christy Skelton. M.S. had a documented increase in behavioral disruptions in frequency and severity beginning in January 2016. During first grade, M.S. was sent to the office for eight discipline referrals. On January 27, 2016, David Jennings—the principal at Maize Central Elementary School—decided to suspend M.S. for hitting, kicking, and spitting on peers and adults. Before this suspension, the school followed the behavioral strategies in M.S.'s IEP, but they had proved ineffective. M.S. was suspended again on March 4, 2016, for throwing items at teachers and peers. M.S. was suspended a third time on March 7, 2016, after she bit a teacher, threw objects, and attacked classmates. As a result of this outburst, six students were injured. The purpose of M.S.'s suspensions was to keep others—primarily her peers—safe.

In response to M.S.'s behavioral issues and Defendants' recommendation that she be pulled out of the general education classroom for her core subject areas, Clasen requested that the IEP team complete a new FBA of M.S. After considering this request, the IEP team denied the request for a new FBA.

M.S. remained at Maize Central Elementary for second grade during the 2016-2017 school year. At the end of the year, the IEP team recommended that M.S. be reassigned to the FAA classroom. Since there was not an FAA classroom at Maize Central Elementary, M.S. moved to the nearby Pray-Woodman Elementary School for FAA education.

M.S.'s parents filed a complaint with the Kansas State Department of Education ("KSDE") on March 24, 2016, requesting a due process hearing. The parties, represented by counsel,

presented witness testimony and hundreds of pages of exhibits over the course of 10 days, beginning August 30, 2016, and ending October 10, 2018. The hearing created approximately 2,400 pages of transcript from 24 witnesses. The Hearing Officer entered his decision on May 2, 2017, finding for Defendants on four issues: (1) whether Defendants violated M.S.'s IEP by removing M.S. from the least restrictive environment in which she can receive a FAPE; (2) whether Defendants failed to implement the IEP, thereby denying M.S. a FAPE in the least restrictive environment; (3) whether Defendants violated M.S.'s IEP by making a substantial change in her placement without parental consent; and (4) whether Defendants violated M.S.'s IEP by treating her parents in a punitive manner for their revocation of consent to certain IEP changes.

M.S.'s parents appealed this decision to the KSDE, and the state-level review officer affirmed the Hearing Officer's decision on August 24, 2017. This action was commenced shortly thereafter. Clasen seeks judicial review of the administrative decision under the IDEA.

Clasen also asserts claims pursuant to the ADA and the Rehabilitation Act. For most of Clasen's allegations under these statutes, she relies on the bulk of the facts stated above. Clasen also contends that Defendants retaliated against her by scheduling IEP meetings at times when it is impossible for her to attend. The record indicates that Defendants worked extensively with Clasen to try to find a mutually agreeable time to conduct IEP team meetings. School teachers in Defendants' district are under a negotiated contract that prevents Defendants' from requiring teachers' presence at meetings after 4:00 p.m. Accordingly, IEP meetings do not typically start meetings after 4:00 p.m. As a result, there were challenges scheduling IEP meetings with M.S.'s parents. Clasen wanted to meet on evenings and weekends, which Defendants' employees were

not always able to do.[7]  The parties encountered difficulty finding mutually agreeable dates in spring 2016 for IEP meetings.  M.S.'s parents objected to the IEP meeting on May 16, 2016, because Clasen was unable to arrive on time.[8]  Defendants notified the parents that the meeting could not be moved, but that the parents could still arrive late in order to participate.

## II.     Legal Standard

### A.     IDEA Administrative Record Review

Under the IDEA, plaintiffs may seek judicial review of administrative findings.[9]  When reviewing IDEA proceedings, courts do not apply the deferential "substantial evidence" standard typical in the review of administrative proceedings.  Instead, courts must independently decide whether the IDEA requirements have been met under a modified *de novo* standard.[10]  In accordance with this modified *de novo* standard, courts must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving due weight to the administrative proceedings below."[11]  Giving due weight to the administrative proceedings means that reviewing courts must consider the hearing officer's factual findings as *prima facie* correct.[12]  The burden of proof in an IDEA case is on the party seeking relief.[13]

---

[7] To accommodate Clasen, Defendants held some meetings that went past 5:00 p.m.  In one instance, Defendants' employees came in on a snow-day to accommodate Clasen.

[8] Dr. Nance made numerous attempts to work with the parents on scheduling this particular meeting; however, the parties were unable to arrive at another mutually agreeable date and time.

[9] 20 U.S.C. § 1415(i)(2).

[10] *Murray v. Montrose Cty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995).

[11] *Id.* (internal quotations omitted).

[12] *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

[13] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005).

## B.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[14]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[15]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[16]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[17]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[18]  The court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[19]

## III.      Analysis

## A.      IDEA Claims

Clasen seeks judicial review of an administrative proceeding under the IDEA, alleging both substantive and procedural violations of the Act.  The substantive IDEA claims in this case hinge on whether the Defendants provided M.S. with a FAPE in the least restrictive environment.  The parties disagree as to how frequently M.S. should have been pulled out of her regular education

---

[14] Fed. R. Civ. P. 56(c).

[15] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[16] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[17] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[18] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[19] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

classroom to be provided with special education services. Clasen also alleges that the administrative hearings violated the procedural safeguards of the IDEA. For the reasons stated below, the Court affirms the KSDE decisions.

The IDEA provides federal funds to help state and local education agencies meet their obligation to educate students with disabilities.[20] A state receiving federal funds under the IDEA must implement policies to ensure that disabled students have access to a "free, appropriate public education," commonly known as FAPE.[21] Under the IDEA, state educational agencies must adhere to substantive and procedural requirements.[22] In Kansas, if a disabled student believes that he is not receiving a FAPE, or that the state has violated IDEA procedures, he can file a complaint with the KSDE.[23] The aggrieved student is then entitled to a due process hearing from an administrative law judge (the "Hearing Officer").[24] During the hearing, parties can present evidence and cross-examine witnesses.[25] Following the hearing, the Hearing Officer creates a record and issues a decision.[26]

The student can appeal the Hearing Officer's decision to the Kansas Office of Administrative Hearings.[27] At that stage, another administrative law judge (the "Review Officer")

---

[20] 20 U.S.C. § 1400, *et seq.*

[21] 20 U.S.C. § 1412(a)(1)(A).

[22] *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.2d 1090, 1091 (10th Cir. 2001).

[23] 34 C.F.R. § 300.507, *et seq.*

[24] 34 C.F.R. § 300.511; K.A.R. 91-40-29(b).

[25] 34 C.F.R. § 300.512.

[26] 34 C.F.R. § 300.513.

[27] K.S.A. 72-3418.

will review the Hearing Officer's decision in its entirety and issue its decision.[28]  After exhausting these two administrative remedies at the state level, a student may file a civil action in federal district court, seeking review of the administrative hearings.[29]  Plaintiffs may state a cause of action under the IDEA by asserting a violation of the Act's substantive or procedural requirements.[30]

### 1.      Substantive Claim

The IDEA's substantive requirement states that a public agency responsible for providing educational services to a disabled student must develop an IEP that is reasonably calculated to provide those services in the least restrictive environment.[31]  "The IEP includes a written statement of the present educational level of [the] child, of annual goals and short-term instructional objectives, and of specific educational services to be provided . . . ."[32]  "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal."[33]

The main issue in this case is whether Defendants provided M.S. a FAPE in the *least restrictive* environment.  When considering possible violations of the least restrictive environment provision, the Tenth Circuit follows the *Daniel R.R.* test.[34]  This test has two parts.  In the first

---

[28] 34 C.F.R. § 300.514; K.A.R. 91-40-51(f).

[29] K.S.A. 72-3418.

[30] 20 U.S.C. § 1415(i).

[31] *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 187–191 (1982); 20 U.S.C. § 1412(a)(5).

[32] *Padilla ex rel. Padilla v. Sch. Dist. No. 1 in City & Cty. of Denver, Colo.*, 233 F.3d 1268, 1270 (10th Cir. 2000) (internal citations and quotations omitted).

[33] *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (internal citations and quotations omitted).

[34] *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 977 (10th Cir. 2004).

part, courts determine whether education in a regular classroom, with the use of supplemental aids, can be achieved satisfactorily.[35]  If not, courts move to the second part and determine if the school district has mainstreamed the child to the maximum extent appropriate.[36]  In the first part of the *Daniel R.R.* analysis, courts weigh the following four factors: (1) steps the school district has taken to accommodate the child in the regular classroom, including the consideration of a continuum of placement and support services; (2) comparison of the academic benefits the child will receive in the regular classroom with those she will receive in the special education classroom; (3) the child's overall educational experience in regular education, including non-academic benefits; and (4) the effect on the regular classroom of the disabled child's presence.[37]

The Court concludes that the four factors under the first part of the *Daniel R.R.* test weigh in favor of Defendants.  As to the first factor—steps the school district has taken to accommodate the child in the regular classroom—multiple employees of the Defendants testified that they had considered modifying the regular education curriculum, training staff to better accommodate M.S.'s special needs, creating alternative classroom accommodations such as visual cues, and placing paraeducators in the classroom to support M.S. during the school day.  They testified that they implemented behavior strategies to the greatest possible extent without implementing a BIP, which required the consent of M.S.'s parents.[38]  Clasen has failed to establish by a preponderance

---

[35] *Daniel R.R. v. Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989).

[36] *Id.*

[37] *Nebo*, 379 F.3d at 976 (citing *Daniel R.R.*, 874 F.2d at 1048-50).

[38] Clasen's main argument on this factor is that Defendants refused to complete a new FBA of M.S. before re-evaluating her IEP.  However, as will be explained in greater detail below, the IEP team was not required to perform another FBA since the proposed IEP changes were not a result of disciplinary actions.  Additionally, Dr. Skelton testified that the IEP team offered to perform another FBA during the dispute resolution session, but that Clasen refused this offer.

of the evidence that the Defendants took insufficient steps to accommodate M.S. in the regular classroom, and therefore the first factor of the first part of the *Daniel R.R.* test weighs in favor of Defendants.

The second factor of the first part of the *Daniel R.R.* test also weighs in favor of the Defendants. At the KSDE hearing, multiple witnesses testified that M.S. would receive substantially worse academic benefits in a regular classroom than she would in a special education classroom. They indicated that M.S. would benefit more from the smaller class sizes, one-on-one attention, and instruction tailored to her skill-level and special needs. On the other hand, multiple witnesses testified that M.S. did not have the necessary skill to successfully maneuver the faster pace of the larger, general education classroom. As a result, the Court concludes that Clasen has failed to show by a preponderance of the evidence that the second factor of the first part of the *Daniel R.R.* weighs in her favor.

The third factor of the first part of the *Daniel R.R.* test also weighs in favor of the Defendants. At the hearing, multiple witnesses testified that M.S. frequently exhibited negative behavior while in the general education classroom. The record shows that M.S. was unable to successfully and consistently access the general education curriculum, even with attempted modifications, accommodations, and supplementary aids. Although one witness testified that M.S.'s social skills would benefit from exposure to students in the general education classroom, M.S.'s IEP did not remove her entirely from the general education classroom, but only in her core subject areas. For her remaining classes, M.S. could interact socially with her general education classmates. Taken together, Clasen has failed to carry her burden to prove, by a preponderance of the evidence, that the third factor weighs in her favor.

Finally, the fourth factor of the first part of the *Daniel R.R.* test weighs in favor of the Defendants. Sufficient evidence in the record indicates that M.S.'s presence in the general education classroom oftentimes had negative consequences for the rest of the class. M.S. was at times disobedient, defiant, and violent. These behaviors—and the teacher's necessitated responses—disrupted the classroom. While teachers in the special education classroom receive more nuanced training in confronting misbehaviors, the general education teacher could not always appropriately handle M.S.'s behavior without negatively impacting the experience of the other students. The Court concludes that the four factors weigh in favor of Defendants and that M.S.'s education could not be satisfactorily achieved in a regular classroom, even with the use of supplemental aids.

Moving on to the second part of the *Daniel R.R.* test, the Court concludes that the Defendants mainstreamed M.S. to the maximum extent appropriate. At the KSDE hearing, the Hearing Officer received evidence and testimony from M.S.'s IEP team, multiple experts, educators, and district representatives, including Ms. Turybury, Ms. Potter, Ms. Pohl, Ms. VanDeest, Mr. Jennings, Dr. Skelton, Ms. Pfeifer, Ms. Jones, Ms. Nibarger, Ms. Koehn, and Mr. Stwalley. All of these individuals—respected professionals in their fields—testified that the least restrictive environment for M.S.'s FAPE was a special education classroom for her core academic subjects and a general education classroom for her remaining subjects. The Hearing Officer found that testimony credible, the Review Officer concurred, and the Court accepts those findings as *prima facie* correct.[39]

---

[39] The Hearing Officer held that the "overwhelming evidence presented by the educational staff supports their position that M.S. needs to be in pullout sessions for her core subjects . . . ."

Furthermore, the IEP team only gradually removed M.S. from the regular education classroom. The IEP initially pulled M.S. out of only part of her language arts class. However, when the team re-evaluated M.S.'s results in the general education classroom, they determined that the least restrictive environment for M.S.'s core subject areas was the special education classroom. Taken as a whole, the Court concludes that Clasen has failed to carry her burden to prove, by a preponderance of the evidence, that Defendants failed to mainstream M.S. to the maximum extent appropriate under the second part of the *Daniel R.R.* test.

The Court views the Hearing Officer's findings as *prima facie* correct under the modified *de novo* standard of review. Clasen has not overcome this presumption. The Court therefore affirms the KSDE decisions and denies Clasen's substantive IDEA claim.

### 2.    Procedural Claim

Clasen alleges that Defendants violated the procedural requirements of the IDEA by substantially changing M.S.'s placement without parental consent or notice, by retaliating against her for not consenting to certain IEP changes, and by failing to perform an additional FBA. To establish a *prima facie* case of liability for violation of the IDEA's procedural requirements, a plaintiff must prove that the agency responsible for providing educational services to the disabled student failed to comply with either (1) the IDEA's identification, evaluation, or placement procedures, or (2) the IDEA's procedural safeguards, including the opportunity to make a complaint, to receive notice of a proposal or refusal to change a student's placement, and to have an impartial due process hearing.[40] The Court will address each of Clasen's arguments in turn.

---

[40] 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2).

Clasen first alleges that Defendants substantially changed M.S.'s placement without parental consent or prior written notice. In Kansas, school districts must obtain parental consent before taking any of the following actions: "(1) [c]onducting an initial evaluation or any reevaluation of [a disabled] child; (2) initially providing special education and related services . . . or (3) making a material change in services to, or a substantial change in the placement of, a [disabled] child. . ."[41] A "substantial change in placement" means "the movement of an exceptional child, for more than 25 percent of the child's school day, from a less restrictive environment to a more restrictive environment or from a more restrictive environment to a less restrictive environment."[42] "Before developing or changing a child's IEP, the agency must provide written notice to the parents."[43]

The parties present two competing interpretations of this statute. Defendants agree with the KSDE's interpretation of the statute: that only each separate change of placement needs to fall below the 25 percent threshold. Dr. Skelton testified that any change had to be by more than 108 minutes to meet the 25 percent threshold. Further testimony showed that the change for the reading placement in the April 2015 IEP was 75 minutes, which was a 17 percent difference. Similarly, the change for the math placement in the February 2016 IEP was 70 minutes, which was also approximately a 17 percent difference. Based on this evidence, both the Hearing and Review Officer concluded that neither change constituted a substantial change in placement under Kansas

---

[41] K.A.R. 91-40-27.

[42] K.A.R. 91-40-1(sss).

[43] *Padilla*, 233 F.3dd 1270.

law, and, as a result, did not require parental consent. This conclusion was consistent with the finding of the state investigator regarding this same legal issue in the 2013 state complaint.[44]

On the other hand, Clasen interprets the statute to mean that individual changes, whilst separately below the 25 percent threshold, cannot aggregate to more than a 25 percent change. The parties do not cite controlling or persuasive authority interpreting this statutory provision. The Court agrees with Clasen's sentiment that "if Defendants' arguments were taken to their logical conclusion, a school district could change the entirety of a student's IEP without parental consent in one school week—so long as it evenly spread out the changes to be less than 25% each day." The Kansas legislature certainly enacted this statute to avoid unreasonable results. However, Clasen's logical analysis loses most of its bite in this case, since Defendants changed M.S.'s placement first in April 2015 and again in February 2016. During that 10-month interim period, the IEP team continued to monitor—and met multiple times to evaluate—M.S.'s educational performance. The IEP team further changed M.S.'s placement in February 2016 only after observing marginally successful, but less than ideal, results under the April 2015 change. The record in this case clearly indicates that the Defendants were not simply spacing out the placement changes to circumvent the statutory provision. They made subsequent changes to the IEP in good faith. Clasen has failed to overturn, by a preponderance of the evidence, the presumption of the *prima facie* correctness of the Hearing Officer's findings. As a result, the Court concludes that Defendants' decision to increase M.S.'s special education placement without parental consent did not violate the procedural requirements of the IDEA.

---

[44] Clasen admitted during her testimony that she knew this was the law but disagreed with it.

Even though Defendants did not require parental consent to increase M.S.'s special education placement, they were required to provide M.S.'s parents with prior written notice of the placement changes. However, they failed to provide such notice before they changed M.S.'s placement in February 2016 and after they denied Clasen's request for a new FBA. As a result, the Defendants violated the IDEA procedural requirement to provide parents with prior written notice before a change in placement. With that being said, the Court agrees with the Review Officer's decision that—in this case—such an oversight was a harmless error, not impacting Clasen or M.S.'s FAPE.[45]

Clasen next contends that Defendants procedurally violated the IDEA by retaliating against her and M.S. for her refusal to consent to the aforementioned IEP changes. Under the IDEA, "[t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child."[46] The IDEA requires that parents be members of the IEP team and that school districts make efforts to ensure their participation.[47] However, a placement decision may be made without the involvement of the parents if the school district is unable to obtain the parent's participation.[48] But whether the parents affirmatively withhold their consent or simply decline to participate in the district's

---

[45] Absent other procedural or substantive violations, the Court declines to fashion a remedy for this harmless procedural error. Similarly, the Review Officer concluded: "The failure of the Districts to conduct a second FBA or provide prior written notice to the Parents is a procedural violation, but it does not rise to the level of denial of a FAPE."

[46] *Rowley*, 458 U.S. at 207.

[47] 20 U.S.C. §1414(d)(1)(B)(i) (requiring parents be members of IEP team); 20 U.S.C. §1414(e) (requiring that parents are part of any group that makes decisions regarding the educational placement of the child).

[48] 34 C.F.R. §300.501(c)(4); 34 C.F.R. §300.322(a) (stating that parents simply must be "afforded the opportunity to participate").

proceedings, "[a] public agency may not use a parent's refusal to consent to one service or activity . . . to deny the parent or child any other service, benefit, or activity of the public agency . . . ."[49]

Clasen alleges that Defendants suspended M.S. from school in retaliation for Clasen's revocation of consent on the modified IEP.[50] The record does not support this allegation. For one thing, M.S. was first suspended before the actions that allegedly caused the retaliation. Furthermore, the suspensions that actually occurred after Clasen's revocation of consent were in reaction to M.S.'s misbehavior in class. Multiple witnesses testified that M.S.'s behavior deteriorated during the first half of 2016. During this time, M.S. was frequently disruptive and violent towards her classmates and teachers. Only in response to these decisions, and out of concern for other students' safety, did Jennings suspend M.S. The Court concludes that Clasen has failed to show, by a preponderance of the evidence, that Defendants retaliated against her or M.S.

Finally, Clasen alleges that Defendants violated the procedural requirements of the IDEA by refusing to perform an additional FBA of M.S before increasing the time M.S. spent in the special education classroom. The IDEA requires a new FBA only under limited circumstances: in the wake of a placement change for disciplinary reasons.[51] When a disabled child who has violated the code of student conduct is removed from her current educational placement to an alternative

---

[49] 34 C.F.R. § 300.300(d)(3).

[50] Clasen also alleges that Defendants retaliated by moving IEP Team meetings to times that were inconvenient for her. However, the Court agrees with the Hearing Officer that this allegation, as well as the other retaliation allegations, are contrary to witness testimony and other evidence. Clasen has failed to meet her burden on this claim to overturn the presumption that the Hearing Officer's findings are *prima facie* correct.

[51] The term "functional behavioral assessment" appears twice in the IDEA, both times under the section outlining procedural safeguards to be followed when a disabled child who has violated the code of student conduct is removed from her current educational placement to an alternative educational setting for more than 10 school days. 20 U.S.C. § 1415(k)(1)(D-E). Additionally, the Review Officer correctly noted that "[n]umerous courts have found that the failure to conduct an FBA is not a procedural violation of the IDEA," citing multiple Court of Appeals cases.

educational setting for more than 10 school days, the student shall continue to receive educational services, so as to enable the child to continue to participate in the general education curriculum. If the IEP team determines it is appropriate, it can conduct a new FBA and implement behavioral intervention services and modifications designed to address the behavior violation.[52] Additionally, the IEP team is obligated to conduct an FBA if it determines that the conduct was a manifestation of the student's disability.[53] Absent these limited circumstances, the IDEA does not require the IEP team to honor a parental request for a new FBA.

The Court concludes that Defendants did not violate the procedural requirements of the IDEA by denying Clasen's request to perform a new FBA. Even though Clasen had requested an additional FBA in early 2016, the limited circumstance of student discipline was not present in M.S.'s case. Rather, the IEP team determined, as outlined above, that M.S. could only receive a FAPE if she was pulled out of the general education classroom for her core academic subjects. The record thoroughly indicates that this determination was not a disciplinary response to M.S.'s misconduct. As a result, the IEP team was not required to perform a new FBA during their reevaluation process in the spring of 2016. The Court concludes that Defendants did not violate the procedural requirements of the IDEA by failing to conduct a new FBA.

**B.    Rehabilitation Act and ADA Claims**

In addition to her IDEA claims, Clasen asserts claims under § 504 of the Rehabilitation Act and Title II of the ADA. She alleges that USD 266 and SCAESIC 618 discriminated and

---

[52] 20 U.S.C. § 1415(k)(1)(D).

[53] 20 U.S.C. § 1415(k)(1)(F) (Additionally, if a BIP has already been developed, the IEP team must review the BIP and modify it, as necessary, to address the behavior).

retaliated against M.S. because of her disability. The parties now move for summary judgment in favor of their respective positions.

### 1.    *Discrimination*

Discrimination claims under § 504 of the Rehabilitation Act and Title II of the ADA, "involve the same substantive standards, [so courts] analyze them together."[54]  Both § 504 and Title II of the ADA state that no individual with a disability shall, "by reason of" such disability, be subjected to discrimination.[55]  To state a *prima facie* claim under the Rehabilitation Act or the ADA, a plaintiff must allege that: (1) she is disabled; (2) she is "otherwise qualified" to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against the plaintiff.[56]  Furthermore, a plaintiff must allege intentional discrimination.[57]  Intentional discrimination does not require proof of "personal animosity or ill will."[58]  Instead, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."[59]  Put another way, "[t]he test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) knowledge that a harm to a federally protected right is substantially likely . . . and (2) a failure to act upon that . . . likelihood."[60]

---

[54] *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1245 (10th Cir. 2009) (internal citations omitted).

[55] 29 U.S.C. § 794; 42 U.S.C. § 12132 (emphasis added).

[56] *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008).

[57] *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153–54 (10th Cir. 1999).

[58] *Id.* at 1153.

[59] *Id.*

[60] *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (internal citations omitted).

"[F]ailure to act is a result of conduct that is more than negligent, and involves an element of deliberateness."[61]  Finally, under the ADA and Rehabilitation Act, a plaintiff must show that she was qualified for the benefits she sought and that she was denied those benefits "solely by reason of [her] disability."[62]

The parties agree that the first three elements of discrimination are present in this case. M.S.'s is a disabled student that is enrolled in a public school and receives special education services.  It is undisputed that the Defendants received federal financial assistance to administer those special education services.  The primary issue in this case is whether Clasen has made a *prima facie* case as to the fourth element: that the special education program discriminates against M.S.

Clasen alleges that Defendants discriminated against M.S. in the following eight ways: (1) excluding her from math and language arts in regular education without making accommodations for her disability; (2) failing to develop an appropriate behavior intervention plan with an appropriate evaluation by knowledgeable personnel; (3) failing to distribute the behavior interventions that were developed among all staff; (4) failing to consistently implement the behavior modifications that had been developed; (5) placing M.S. in a FAA classroom in a building she would not otherwise attend if she was not disabled; (6) removing M.S. from the school she would attend absent her disability; (7) treating her in a derogatory manner because of her disability; and (8) retaliating against M.S. and her parents because the parents advocated for M.S.'s rights.

---

[61] *Id.*

[62] *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (internal citations omitted) (emphasis added).

"Where Section 504 and ADA claims follow on the heels of an IDEA claim . . . a plaintiff cannot establish a viable claim under the non-IDEA causes of action, where the predicate acts, upon which [s]he has premised those claims, have withstood judicial review under the IDEA."  In this way, "principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under . . . the ADA and Section 504."[63]  The Court concludes that Clasen's claims 1-6 and 8 (listed above) are properly governed by the IDEA procedures and therefore redundant as separate claims.  Those seven claims are restatements of, or directly relate to, IDEA provisions pertaining to the formulation and implementation of a FAPE.  The proper avenue for alleging violations of those statutory rights is an IDEA administrative hearing—which Clasen has pursued and exhausted.  As explained above, the Court reviewed those proceedings and affirmed the KSDE's findings and holdings.  Clasen cannot recover under the ADA and Rehabilitation Act for the same predicate actions.  As a result, the Court grants summary judgment to Defendants on Clasen's ADA and Rehabilitation Act discrimination claims.

2.    *Retaliation*

Clasen's only remaining claim is that the Defendants "treat[ed] [M.S.] in a derogatory manner because of her disability."  The Court construes this allegation as a retaliation claim under the Rehabilitation Act and the ADA.[64]  Absent direct evidence of retaliation, retaliation claims are analyzed under the *McDonnell Douglas* framework.[65]  Under this framework, the plaintiff must

---

[63] *Miller,* 455 F. Supp. 2d at 1312–13, *aff'd.*, 565 F.3d 1232 (10th Cir. 2009) (internal citations and quotations omitted).

[64] The standard to prove retaliation under Section 504 of the Rehabilitation Act and the ADA is the same. *Jarvis v. Potter*, 500 F.3d 1113, 1125 (10th Cir. 2007).

[65] *See Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972).

first establish a *prima facie* case of retaliation.[66]  The burden then shifts to the defendant to articulate some legitimate, non-retaliatory reason for the adverse action.[67]  The plaintiff then bears the ultimate burden of showing that the defendant's proffered reason is pretextual.[68]

To establish a *prima facie* case of retaliation, the plaintiff must prove that (1) she engaged in a protected activity; (2) she was subjected to an adverse action subsequent to or contemporaneous with that protected activity; and (3) there was a causal connection between her protected activity and the adverse action.[69]

The Court acknowledges—and the parties do not contest—that Clasen engaged in a protected activity by advocating for M.S.'s rights under the IDEA.  So the first element is met.  As to the second element, Clasen alleges that she suffered an adverse action when Defendants pulled M.S. out of the general education classroom more than Clasen requested.  She also alleges that Defendants' decision to move M.S. to the FAA classroom in a separate building was an adverse action.  Assuming, for the purposes of this motion, that Defendants' actions were adverse, Clasen has not shown a causal connection between her protected activity and Defendants' adverse response.  As a result, the Court concludes that Clasen has failed to establish a *prima facie* case of retaliation under the ADA and Rehabilitation Act.

Furthermore, Defendants have shown an abundance of non-retaliatory reasons for their actions.  The Court previously considered those reasons in the context of the IDEA review,

---

[66] *Foster,* 830 F.3d at 1186; *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028, 1037–38 (10th Cir. 2011).

[67] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802).

[68] *See id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

[69] *Foster*, 830 F.3d at 1186–87.

concluding that the IEP team did not deny M.S. a FAPE, but rather took considerable steps to provide her with one.  Finally, Clasen is unable to point to anything in the record indicating that Defendants' reasons regarding M.S.'s educational placement were pretextual.  Clasen's claims of retaliation under the ADA and Rehabilitation Act do not withstand scrutiny under the *McDonnell Douglas* analysis.  As a result, the Court grants Defendants summary judgment on Clasen's retaliation claim.

## IV.    Conclusion

The Court affirms the KSDE's decisions on the IDEA claims because Clasen has not shown that USD 266 or SCAESIC 618 violated the substantive or procedural requirements of the IDEA.  Furthermore, Defendants have shown there is no genuine issue as to any material facts. The Court concludes that Clasen redundantly states IDEA claims under the auspices of the ADA and Rehabilitation Act's provisions against discrimination and that Defendants are therefore entitled to summary judgment as a matter of law.  The Court further concludes that Defendants are entitled to summary judgment as a matter of law on Clasen's ADA and Rehabilitation Act retaliation claim.

**IT IS THEREFORE ORDERED** that Defendant USD 266's Motion for Judgment on the Administrative Record (Doc. 127) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant SCAESIC 618's Motion for Judgment on the Administrative Record (Doc. 131) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant USD 266's Motion for Summary Judgment on the Section 504 and ADA Claims (Doc. 132) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant SCAESIC 618's Motion for Summary Judgment on the Section 504 and ADA Claims (Doc. 133) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 129) is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

This case is closed.

Dated this 27th day of August, 2019.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE